Barbara S. CLANTON, et al.,
Plaintiffs-Appellees,

v.

ORLEANS PARISH SCHOOL BOARD, et
al., Defendants-Appellants.

Nos. 79–1300, 79–2126.

United States Court of Appeals,
Fifth Circuit.
Unit A

July 6, 1981.

Nelson, Nelson and Lombard, Ltd., John P. Nelson, Jr., Larry Samuel, III, Richard G. Vinet, New Orleans, La., for plaintiffs-appellees.

Polack, Rosenberg & Rittenberg, Franklin V. Endom, Jr., New Orleans, La., for defendants-appellants.

Before COLEMAN, RUBIN and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Seven black female New Orleans, Louisiana public school teachers (the teachers) brought this action against the Orleans Parish School Board (the Board),[1] contending that the Board's maternity leave policy for the 1972–73 school year violated their Fourteenth Amendment rights to equal protection and due process and the Title VII (Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*) proscription of race and sex discrimination in employment. Five of the teachers prevailed in the district court on their § 1983 claims for backpay and attorneys' fees. The liability of the individual defendants was grounded upon constitutional violations coupled with the district court's rejection of the individual defendants' qualified immunity defense. The district court assessed attorneys' fees against all defendants in their official and individual capacities under 42 U.S.C. § 1988. On appeal, we affirm the district court's judgment insofar as it imposed liability for backpay on the Board. We find that the Board's policy violated Title VII, but we reverse the district court's finding that the Board's policy established an irrebuttable presumption violative of the due process clause. We reverse the judgment of the district court on the issue of the defendants' individual liability for backpay, concluding that the individual defendants established as a matter of law a qualified immunity defense. Finally, we affirm the district court's attorneys' fee award with respect to the Board, but reverse the award of attorneys' fees against the individual defendants.

## ·I. FACTS

### A. *The Board's Maternity Leave and Sick Leave Policies*

On March 22, 1971, the Board revised its then existing maternity leave regulations. The revised regulations were set out in the

---

1. In addition to suing the Board, the teachers named the following persons as defendants in their official and individual capacities: Mack J. Spears, Mildred J. Blumberg, Lloyd Rittiner, Edward H. Knight, and Robert C. Smith, the members of the Board; Gene Geisert, Superintendent of the New Orleans Public Schools; Alfred B. Hebeisen, Assistant Superintendent of Personnel of the New Orleans Public Schools; and William G. Petersen, Assistant Director of Personnel of the New Orleans Public Schools.

For the sake of convenience, this opinion will refer to the defendants collectively and in their official capacities as the Board, and will refer to the defendants collectively and in their individual capacities as the individual defendants.

school district's Personnel Handbook of 1971. These regulations remained in effect until January 9, 1973, when the Board adopted a new maternity leave policy.[2]

The pre-1973 maternity leave policy contained six essential features.[3] First, a teacher who became pregnant was required to notify the Board of her pregnancy at the beginning of the fourth month of pregnancy and was automatically placed on leave at the end of the sixth month of pregnancy. Second, the maternity leave of absence expired three semesters from the date of commencement of leave. Third, all teachers who intended to return to teaching at the beginning of the first semester of the open-

2. This opinion will refer to the maternity leave policy in effect from March 22, 1971 to January 9, 1973 as the pre-1973 policy. The policy adopted on January 9, 1973 will be termed the post-1973 policy.

3. The full text of the pertinent provisions of the pre-1973 maternity leave policy as it appeared in the Personnel Handbook of 1971 is as follows:

> SECTION FIVE
> LEAVES OF ABSENCE
> 5-1-0 MATERNITY
> 5-1-1 Any married woman employed by the Orleans Parish School Board who shall become pregnant shall, *not later than the beginning of the fourth calendar month of pregnancy* (summer months included) notify the Assistant Superintendent for Personnel and, if eligible, shall be *placed* upon leave without salary *no later than the end of the sixth month of pregnancy.* Those ineligible for this leave will be required to resign. Failure to make such application for leave of absence shall be considered as neglect of duty and subject the employee to trial and dismissal, if found guilty.
> 5-1-2 Applications for maternity leave shall be made on the appropriate form (See Appendix C) under Section 5-1-0 of the PERSONNEL HANDBOOK and appropriately endorsed by the applicant's attending physician. Assistant principals, classroom teachers and school clerical employees shall have their applications endorsed by their school principal, and principals shall have their applications endorsed by their District Superintendents, prior to mailing the application to the Assistant Superintendent for Personnel. All other employees applying for maternity leave shall have their application endorsed by their Department and/or Division Head, who will forward it with a "Personnel Action Request" Form PD-3 (See Appendix G) to the Assistant Superintendent for Personnel.
> 5-1-3 After consideration of the endorsement of the principal, District Superintendent, Department Head or Division Head, the Assistant Superintendent for Personnel will notify the applicant of the effective date of her leave.
> 5-1-4 The leave of absence granted under this authority shall not exceed three (3) school semesters for teaching employees or one (1) calendar year for non-teaching employees.
> 5-1-5 If, during the period covered by the leave, there is occasion to apply for additional similar leave, application shall again be made as soon as she is aware of her condition. In such case, the prior leave shall be terminated at the date of the subsequent application, and an additional leave, not to exceed three (3) school semesters for teaching personnel only, may be granted from that date.
> 5-1-6 Teaching employees who are employed on a school session basis will regularly be required to return from their leave at the beginning of the first semester of the opening of a school session. In order to determine substitute needs, all such persons on maternity leave will be required to notify the *Assistant Superintendent for Personnel, in writing, no later than June 1st* of each year whether or not they desire and are able to return to their duties at the beginning of the first semester, if the person desires and is so able to return to duty, if found qualified, the Assistant Superintendent for Personnel will, after the employee has submitted and has received approval of Form HES-4 (See Appendix H), effect an appropriate reassignment. The Orleans Parish School Board has no obligation to return an employee from maternity leave to her former school. If she does not desire or is not able to return to duty, she will be permitted to defer return until the expiration of her leave.
>
> \* \* \* \* \* \*
>
> 5-1-8 While the foregoing regulations are approved as regular policy for handling of maternity leaves, the Assistant Superintendent for Personnel is authorized, if it is in the best interest of the school program, to recommend the return of persons from maternity leaves prior to the expiration of their leaves. When this authority is exercised by the Assistant Superintendent for Personnel, he will effect returns on the basis of priority established after consideration of all the departure dates of the persons on maternity leave and the certification or particular skills of the persons involved, and only after approval of Form HES-4 (See Appendix H).
> (Emphasis in original).

ing of a school session were required to notify the Assistant Superintendent for Personnel (the Superintendent), in writing, no later than June 1st of their desire to return. Fourth, the Superintendent would reinstate a teacher at the expiration of the three semester period after submission and approval of physician's certificate of fitness to teach, but the Board was not required to return a teacher from maternity leave to her former school. Fifth, a teacher could request to be returned from maternity leave prior to the expiration of three semesters, but approval of such a request was within the Superintendent's discretion. Sixth, maternity leave was without salary and teachers on maternity leave were not allowed to use their accumulated sick leave.

The Board also maintained a separate policy for absence occasioned by "personal

4. The full text of the pertinent provisions of the sick leave policy as contained in the Personnel Handbook of 1971 is as follows:

SECTION ONE
ABSENCE
1-1-0 PERSONAL ILLNESS OR EMERGENCY
1-1-1 FOR EMPLOYEES ON A SCHOOL SESSION BASIS
1-1-2 All regular employees, temporary employees and long-term substitute employees who are hired for a school session shall be credited on the date of reporting for duty with ten (10) days to be used for personal illness and/or emergency.
1-1-3 All regular employees, temporary employees and long-term substitute employees who are initially *hired for less than a school session* shall be credited on the date of reporting for duty with one work day, and thereafter one work day each pay period, for each of the twenty-day periods remaining in the balance of that school session to be used for sickness and/or emergency.
1-1-4 All *regular* employees, upon the completion of their first full or partial school session, who continue their employment, shall be credited with an additional ten (10) work days to be used for personal illness and/or emergency and shall accrue to their sick leave any unused days from the previous session without limit thereafter each session.

\* \* \* \* \* \*

1-1-9 PROCEDURE FOR CHARGING ABSENCE DURING FIRST YEAR OF EMPLOYMENT

illness or emergency."[4] Under this sick leave policy, each teacher was credited ten working days per year for sick leave, and the unused days of sick leave would accrue without limit for each school session. A teacher could use any number of current and accrued sick leave days for any personal illness, but not for disability due to pregnancy. An employee expecting to be absent for more than ten work days was required to notify the district in writing and submit a statement from a physician attesting to the reason for the absence and its probable duration. Upon approval of the employee's sick leave request by the Board's doctor, the employee was allowed to return to work on the date his or her doctor certified that the employee would be fit to return.

1-1-10 An employee who is absent because of personal illness or emergency during his first year of employment is required to sign the Payroll Form and indicate the date and cause of absence. In the event the employee is not available to sign the Payroll Form the principal or Department Head shall enter the required information and sign for the absent employee. If the cause of absence is an *emergency* (see definition in Section 1-1-14) the employee will explain the *emergency* on Form 17 A-B (see Appendix A) and turn this form over to the principal or Department Head for forwarding to the Accounting Department and appropriate action by the Assistant Superintendent for Personnel.
1-1-11 If the absence is for *personal illness* and is for more than five (5) consecutive work days, the reverse of Form 17 A-B (see Appendix A) must be completed by the employee's attending physician. If the employee expects to be absent for more than ten (10) consecutive work days by reason of personal illness, he shall immediately notify the Assistant Superintendent for Personnel in writing, including with the letter a statement from the attending physician, attesting to the reason for the absence and probable duration thereof. Upon receipt, the Assistant Superintendent for Personnel will then act upon the employee's request, under the current Board policy for sick leave. Any employee who fails to so notify the Assistant Superintendent for Personnel after (10) consecutive work days of absence is in violation of regulations governing sick leave.
(Emphasis in original).

## B. The Desegregation Program and its Effect on the Return of Teachers from Maternity Leave

During the 1972–73 school year, the New Orleans public school system was undergoing a major faculty readjustment, occasioned by its history of student and faculty racial segregation, that affected the Board's actions with respect to the return of teachers from maternity leave. On October 11, 1967, in the case of *Earl Benjamin Bush v. Orleans Parish School Board*, 205 F.Supp. 893, the district court for the Eastern District of Louisiana issued an order mandating desegregation of students and faculty in the New Orleans public school system.[5]

After taking some steps toward desegregating the faculty of its school system, the Board, on June 10, 1972, adopted a resolution which established a program for implementing the court's order.[6] The Board's resolution ordered, *inter alia*, an involuntary transfer of approximately 1,500 teachers of both races to different teaching positions effective August 28, 1972. About one-third of the entire teaching corps was involved in this involuntary transfer program.

During the period of implementation of the desegregation order, the school district experienced significant student attrition.[7] Because the number of teachers hired for any given year was tied directly to student enrollment, decreasing student enrollment forced the elimination of over 340 teaching

---

5. The portion of the district court's order in *Bush* that concerned faculty desegregation in the New Orleans public schools was as follows:

 *Faculty and Staff.*

 (a) Faculty Employment. Race or color shall not be a factor in the hiring, assignment, reassignment, promotion, demotion or dismissal of teachers and other professional staff members, including student teachers, except that race may be taken into account for the purpose of counteracting or correcting the effect of the segregated assignment of faculty and staff in the dual system. Wherever possible, teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race. Whenever possible, teachers shall be assigned so that more than one teacher of the minority race (White or Negro) shall be on a desegregated faculty. The School Board began a program of faculty and staff desegregation at the start of the 1966–67 school year, and the Board shall take positive and affirmative steps to accomplish the desegregation of school faculties and to achieve substantial desegregation of the faculties in as many schools as possible for the 1967–68 school year. The tenure of teachers in the system shall not be used as an excuse for failure to comply with this provision. The Board shall establish as an objective that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or White pupils in the school.

6. The pertinent part of the Board's resolution provided as follows:

 1. Effective not later than August 28, 1972, the principals, teachers and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or White students.

 2. For the school year 1972–1973, the staff described above will be assigned so that the ratio of Negro or White teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system.

 3. As used in the preceding paragraph, the word "substantially" means as near to 50% Negro and 50% White as possible, with a 10% tolerance allowed in the secondary schools (i. e. in each elementary and secondary school, the faculty and other staff shall be assigned so that 50% of each shall be Negro and 50% shall be White; and, in no event shall there be less than 40% nor more than 60% of either race in any elementary school or less than 45% nor more than 55% in any secondary school).

 \* \* \* \* \* \*

 6. The Superintendent of Schools is hereby directed to immediately initiate such actions and procedures as may be required in order to implement this resolution.

7. The parties stipulated to the following facts and figures with respect to the number of students and teaching positions in the New Orleans public schools for 1971–73. For the 1971–72 school session, the total number of students enrolled was 107,742. In the following year, 1972–73, the total enrollment was 104,039, a decrease in enrollment of approximately 3,700 students from the previous year. For the 1971–72 school session, there were 4,946 teachers employed by the Board. However, for the following year, 1972–73, the total employed was 4,603, a reduction of over 340 teaching positions.

positions for the 1972–73 school year. Faced with this surplus of teachers, the Board decided to retain as "relief" teachers those teachers for whom no teaching posts were available. These "relief" teachers received full pay and acted as substitutes when necessary. No surplus teachers were terminated or placed on forced leave due to lack of vacancies. But teachers desiring to return from maternity leave prior to the three semester limit were refused reinstatement to the payroll—as regular or "relief" teachers—for varying lengths of time based on the lack of teaching vacancies.

### C. The Plaintiff Teachers and the Development of the Suit

On December 8, 1972, seven black female New Orleans public school teachers—Barbara S. Clanton, Marion Davis, Joyce J. Joseph, Carolyn Streams, Verna Jones, Yvette Monette and Kathleen Wooten—filed suit against the Board and the individual defendants in federal district court. While the facts of the teachers' pregnancies and the actions taken by the Board with respect to their maternity leaves differed, the teachers had four common characteristics: (1) prior to her pregnancy, each had been a New Orleans public elementary or secondary school teacher; (2) each had become pregnant and had gone on maternity leave before the beginning of the 1972–73 school year; (3) each had requested to return from maternity leave sometime during the 1972–73 school year and had submitted an approved certificate of physical fitness to return to work; and (4) the Superintendent deferred reinstatement beyond the date each teacher was willing and physically able to return to work.

The teachers complained, *inter alia*, of the Board's actions in (1) requiring them to go on leave at the end of their sixth month of pregnancy, (2) refusing them accumulated sick leave benefits during the leave of absence, and (3) refusing them reinstatement although they were willing and fit to return. They asserted that the Board's actions constituted discrimination on the basis of race, sex, and pregnancy violative of their rights under the due process and equal protection clauses of the Fourteenth Amendment. They requested preliminary and permanent injunctive relief, declaratory relief, damages (including backpay and sick leave pay), and attorneys' fees under 42 U.S.C. §§ 1981 and 1983. The teachers also sought to represent a class consisting of all New Orleans public school teachers who had experienced discrimination by virtue of the Board's maternity leave policies.

In answer to the teachers' complaint, the Board argued that none of its maternity leave policies were unconstitutional. In addition, the Board defended its failure to return the teachers to work on the dates they were willing and fit to return on the basis that some of the teachers failed to meet the June 1st deadline for notification of intent to return to work and that, due to the elimination of teacher positions brought about by the desegregation program, no vacancies in teaching positions existed on the dates upon which the teachers sought to return.

On January 9, 1973, the Board adopted a new maternity leave policy.[8] On two occasions in January and February, 1973, the district court denied the teachers' request for a preliminary injunction.

In the spring of 1973, two teachers whose claims were very similar to those of the original plaintiffs, Zeola Kelly and Annie Davis, were allowed to enter the lawsuit as plaintiff intervenors. On July 13, 1973, the teachers filed an amended complaint which asserted a cause of action under Title VII, 42 U.S.C. § 2000e *et seq.*, based on the factual allegations contained in the original

---

**8.** The post–1973 maternity leave policy provided for commencement of maternity leave no later than the 32nd week of pregnancy, with the opportunity to apply for an extension of up to four weeks. The minimum duration of maternity leave was four weeks before and six weeks after delivery of the child. Maternity leave was without pay; but up to ten days of unused, current and accrued sick leave pay could be utilized. If, as a result of protracted illness related to pregnancy, the teacher's disability extended beyond ten working days, she could be considered for additional sick leave.

complaint. On May 8, 1974, the district court denied the teachers' motions for class certification and summary judgment. In the pretrial order filed on July 26, 1976, the parties stipulated to the dismissal of Joyce Joseph from the action on the basis that her claim for backpay had been satisfied. Thus, as of July 26, 1976, eight teachers remained in the lawsuit as individual plaintiffs, each of whose claims involved the pre–1973 maternity leave policy.

On August 20, 1976, Patricia F. Lyons moved to intervene as a plaintiff in the suit. Unlike the complaints of the other teachers, Lyons' complaint was based on the Board's post–1973 maternity leave policy, since her pregnancy occurred in the latter part of 1975. On the same day, the teachers renewed their motion for class certification, contending that they were proper class representatives for both the group of teachers whose maternity leaves were taken under the pre–1973 policy and those teachers whose maternity leaves were taken under the post–1973 policy. On September 28, 1976, the district court denied Lyons' motion to intervene and the teachers' motion for class certification.

The claims of the eight individual teachers went to trial before the judge on October 18, 1976. In the main, the evidence introduced in the case was documentary.

## II. THE DISTRICT COURT'S OPINION AND THE ISSUES ON APPEAL

### A. The District Court's Opinion

On November 7, 1978, the district court issued its opinion. After reviewing the Board's pre–1973 maternity and sick leave policies and noting the difficulties encountered by the Board in implementing its faculty desegregation plan in the face of declining student enrollment, the district court addressed the merits of the teachers' claims. First, finding that all of the teachers' claims flowed from implementation of the Board's pre–1973 policy, the district court refused to rule on the legality of the post–1973 policy. Second, the district court dismissed the teachers' claim of sex discrimination under 42 U.S.C. § 1981 on the basis that § 1981 does not apply to claims of gender discrimination. Third, the district court found that it had jurisdiction of the teachers' claims under Title VII, but rejected the claims on the merits, holding that the teachers had failed to prove that the maternity leave regulations discriminated on the basis of gender. Fourth, the district court addressed the § 1983 claims. It found that there was no actionable sex discrimination, and that the June 1st deadline for notification of intent to return to teaching "was not only reasonable but essential to establishing a firm schedule for the teachers as well as the students." The court also found, however, that the Board's mandatory maternity leave policy "established a conclusive and irrebutable (sic) presumption that between the sixth month of pregnancy and the end of the third school semester following birth, the teacher was physically incapable of performing her teaching function." Finding that this presumption was applied routinely despite medical evidence to the contrary, and that the policy failed to advance any valid state interest, the court, relying on *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), held that the commencement and return provisions of the maternity leave policy violated the due process clause of the Fourteenth Amendment. Although it found that the Board had acted in good faith in carrying out the desegregation program and in implementing the maternity leave policy, the court held that the lack of vacancies brought about by the faculty desegregation program did not constitute a defense to the violation of the teachers' constitutional rights. Fifth, the district court imposed liability on the individual defendants, rejecting their defense of qualified immunity on the ground that while they "acted in good faith to execute the Board policy, they nevertheless should have known that the official actions taken would violate the constitutional rights of the teachers."

The district court then turned to the issue of appropriate relief. Since the maternity leave policy adopted by the Board on Janu-

ary 9, 1973 was substantially different from the pre–1973 policy, the court dismissed the teachers' requests for injunctive and declaratory relief as moot. After reviewing the facts surrounding the maternity leave of each teacher, the district court found that five of the eight teachers—Barbara Clinton, Verna Jones, Yvette Monette, Kathleen Wooten and Zeola Kelly—had given timely notice of intent to return to teaching and were entitled to backpay from the date upon which they were willing and fit to work until the date of their reinstatement. The district court dismissed the claims of the three remaining teachers—Marion Davis, Carolyn Streams and Annie Davis—primarily on the basis that their notification of intent to return was untimely and that no teacher vacancies were available on the dates they wished to return. In addition, the district court held that none of the teachers who claimed backpay for mandatory early commencement of leave had proved that she was capable of working beyond the date she was placed on leave.

Further, on April 9, 1979, after considering the briefs of the parties and hearing argument on the issue of attorneys' fees, the district court ordered the Board and the individual defendants to pay a total of $25,680.47 with interest for attorneys' fees and out-of-pocket expenses.

### B. The Issues on Appeal

The Board and the individual defendants appealed the award of backpay and attorneys' fees to this court. Because the three teachers whose claims were dismissed did not appeal, and because the five teachers who prevailed did not cross appeal on the claims upon which they did not prevail, including their request for class certification, we need consider only the validity of the district court's ruling on the individual claims of the five teachers who prevailed below. Moreover, since the judgment for

backpay in favor of the five teachers was based solely on the return to work provisions of the Board's maternity leave policy, the return provisions are the only aspect of the policy at issue on appeal. Therefore, we are faced with only three issues in this case: (1) whether the district court erred in imposing backpay liability on the Board based on the illegality of the maternity leave return provisions; (2) whether the district court erred in imposing backpay liability on the individual defendants; and (3) whether the district court erred in its award of attorneys' fees against the Board and the individual defendants. We now consider each issue in turn.

### III. THE MERITS OF THE APPEAL

### A. The Backpay Award Against the Board

The district court found that the teachers failed to show that the reinstatement provisions of the Board's maternity leave policy constituted gender discrimination violative of Title VII. Nevertheless, the court determined that the return provisions established an irrational "conclusive and irrebuttable presumption" that all teachers were physically incapable of teaching for three semesters following childbirth.[9] Accordingly, the court found that the return provisions violated the teachers' right to due process under the rationale of *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), and imposed backpay liability on the Board for its constitutional violations.[10] After carefully reviewing the return provisions and the applicable law, we conclude that both of these findings were erroneous. In our view, while the return provisions did not establish an irrebuttable presumption violative of the due process clause, they constituted sex-based discrimination in violation of Title VII.

---

**9.** The district court's opinion assumed that the fixed period of maternity leave extended to three semesters following birth. But the record shows that the total leave period was three semesters, commencing at a point no later than the end of the sixth month of pregnancy. This factual discrepancy, however, is of no significance to the issues on appeal.

**10.** The court found that five of the eight teachers, those who had given timely notice of intent to return, were entitled to a backpay award.

Thus, we affirm the district court's ultimate conclusion that the Board is liable to the teachers for backpay.

### 1. Irrebuttable Presumption?

A review of the Board's pre–1973 maternity leave policy aids in evaluating the application of the irrebuttable presumption analysis of *LaFleur*. The maternity leave policy required that all pregnant teachers be placed on maternity leave no later than the sixth month of pregnancy. The leave expired three school semesters thereafter. A teacher could request to be returned from leave prior to the expiration of the leave period, but approval of such a request was within the Superintendent's discretion. All teachers on maternity leave who wished to return for the fall semester were required to notify the district in writing by June 1st of their desire to return, and all teachers on maternity leave were required to submit and obtain approval of a physician's certificate of fitness to return to teaching.

Like teachers on maternity leave, those who suffered from any illness or disability for more than ten days were required to submit and obtain approval of a physician's certificate of fitness to return. However, those on sick leave were not subject to the June 1st deadline, and the return of teachers on sick leave was not subject to the Superintendent's discretion.[11] Rather, teachers were reinstated from sick leave on the date their doctors certified they were fit to return to work.

In *LaFleur*, the Supreme Court declared that mandatory school board rules requiring teachers to take maternity leave at a fixed point several months before anticipated childbirth, and making them ineligible to return to work until the child was at least three months old violated the due process clause because the rules amounted to conclusive, irrebuttable presumptions of unfitness to teach that were irrational and arbitrary. *LaFleur* is illustrative of a series of decisions in which the Supreme Court has employed the irrebuttable presumption doctrine to invalidate as arbitrary and irrational various rules that afford no opportunity for rebuttal in an individual case. *See, e. g., Turner v. Department of Employment Security*, 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975) (per curiam); *United States Department of Agriculture v. Murry*, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *but see Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). These cases have one crucial feature in common: the rules at issue, by virtue of the fact that they drew hard and fast lines not subject to flexible application in an individual case, embodied conclusive *irrebuttable* presumptions.

We conclude that the return provisions of the Board's maternity leave policy did not establish such an irrebuttable presumption. Had the policy made no provisions for return before expiration of the three semester period, a conclusive presumption of unfitness to teach during the period of leave would have been established. But here the reinstatement policy provided for discretionary approval of applications for early return. By specifically providing a teacher the opportunity to request an early return and to prove her fitness to teach through the doctor's certificate, the Board made the opportunity for rebuttal an integral part of

---

11. Of course, by requiring all teachers to obtain approval of a doctor's certificate of fitness, the Board retained a measure of discretion in acting upon *all* reinstatement requests. However, as the district court specifically found, only teachers on maternity leave were subject to additional discretion in reinstatement, exercised by the Superintendent and limited only by

the requirement that return before expiration of the leave period be "in the best interest of the school program." The record is clear that it was pursuant to this additional and broad discretionary authority that the Superintendent, citing lack of vacancies, refused to grant the teachers' requests for return on the dates they were physically fit to teach.

its reinstatement process. Such flexibility was lacking in all the rules at issue in the irrebuttable presumption cases.

Further, the district court's conclusion that teachers were perfunctorily presumed unfit to teach for a three semester period does not accord with the facts of the case. Not one of the eight teachers in this suit was prevented from returning to work for the entire three semester period. Rather, each teacher was reinstated substantially before the stated expiration of her leave. Indeed, three of the five teachers were returned as relief teachers only slightly more than one month after the date they requested to return. Moreover, the Board has never attempted to defend its delay in reinstating these teachers on the basis that they were unfit to teach. Rather, the Board has specifically admitted that the teachers were physically fit to resume teaching. The Board's reasons for failing to return the teachers to work when they requested were simply the failure of some of the teachers to meet the June 1st notification deadline and the lack of vacancies for the teachers on the dates they sought to return.

We conclude that the facts of this case do not fit the mold of the irrebuttable presumption doctrine. The problem with the reinstatement provisions of the Board's policy is not that they failed to accord individual teachers an opportunity to rebut a presumption of unfitness to teach. Rather, their fatal flaw lies in the discretion vested in the Superintendent to determine when a teacher could return from maternity leave coupled with the absence of such discretion in the Board or the Superintendent with respect to the reinstatement of those on sick leave. The result of this policy was that those on maternity leave could be delayed from returning for a lack of vacancies, a burden on the employment opportunities of female teachers that male teachers were never forced to encounter.

## 2. Title VII

### (a) The Prima Facie Case

The district court held that the teachers failed to prove that the reinstatement provisions of the Board's maternity leave policy constituted gender discrimination violative of Title VII. The court relied upon *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), and *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), for the proposition that pregnancy-based differences in employment practices do not constitute gender-based discrimination violative of Title VII absent proof that classification on the basis of pregnancy "is a mere pretext designed to effect an invidious discrimination against the members of one sex or the other." In our view, *Satty* and *Gilbert* do not lead to the conclusion that Title VII is inapplicable to the discrimination involved in this case. Based on the findings of fact made by the district court, we hold that as a matter of law the Board's reinstatement policy constituted gender-based discrimination violative of Title VII,[12] and we affirm on that basis the backpay award made by the district court.[13]

---

**12.** This holding makes it unnecessary for us to consider whether the Board's reinstatement policy is invalid as a denial of equal protection or violates the due process clause in some way other than by establishing an irrebuttable presumption.

On appeal, the parties' briefs focus solely on the irrebuttable presumption issue; neither brief discusses the validity of the return provisions under equal protection, other theories of due process, or Title VII. However, it is well established that we are free to uphold the district court's judgment on any basis that is supported by the record. *Jaffke v. Dunham*, 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957); *Helvering v. Gowran*, 302 U.S. 238, 245–46, 58 S.Ct. 154, 157–58, 82 L.Ed. 224 (1937); *Stegmaier v. Trammell*, 597 F.2d 1027, 1038 (5th Cir. 1979). Our decision to dispose of this case on Title VII grounds reflects our awareness of our duty to avoid unnecessary adjudication of constitutional questions. *See, e. g., New York City Transit Auth. v. Beazer*, 440 U.S. 568, 583, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979).

**13.** We affirm the district court's finding that it had jurisdiction over the teachers' claims under Title VII. The Board has never disputed its status as an "employer" within the meaning of 42 U.S.C. § 2000e(a), (b). All of the actions taken by the Board with respect to the teachers occurred after March 24, 1972, the effective

Section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a) makes it an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's...sex...; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's...sex....

In *Gilbert*, the Supreme Court held that an employer disability plan providing non-occupational sickness and accident benefits to all employees, but excluding disabilities arising from pregnancy, did not violate Title VII absent a showing that exclusion of pregnancy disability benefits was a pretext for discriminating against women. Identifying its equal protection analysis in *Gedul-*

*dig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), which involved a disability plan "strikingly similar" to the one in *Gilbert*, as "a useful starting point" for analyzing claims of sex-based discrimination under Title VII, the Court reaffirmed its holding in *Geduldig* that classifications based on pregnancy are neutral rather than gender-based. Absent a showing " 'that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other,' " 429 U.S. at 135, 97 S.Ct. at 407, quoting *Geduldig*, 417 U.S. at 496–97 n.20, 94 S.Ct. at 2491–92 n.20, the Court found that classification on the basis of pregnancy does not constitute gender-based discrimination within the meaning of the equal protection clause. General Electric's disability plan was held not to be a mere pretext for discrimination against women. The *Gilbert* opinion recognized the holdings of its prior cases "that a prima facie violation of Title VII can be established in some circumstances upon proof that the *effect of*

date of the amendments which brought state and local government agencies within the scope of Title VII. The defendants in their official capacities are proper defendants, since they are agents of the Board. *See* 42 U.S.C. § 2000e(b); *Curran v. Portland Superintending School Committee*, 435 F.Supp. 1063 (D.C.Me. 1977); *Mitchell v. Board of Trustees*, 415 F.Supp. 512, 516 (D.C.S.C.1976), *rev'd on other grounds*, 599 F.2d 582 (4th Cir.), *cert. denied*, 444 U.S. 965 (1979); *Schaefer v. Tannian*, 394 F.Supp. 1128, 1132 (D.C.Mich.1974).

Moreover, the district court correctly determined that the teachers met all of the statutory prerequisites to maintenance of a Title VII action. Streams, Marion Davis and Clanton filed charges of discrimination with the EEOC in October and November of 1972, well before the 180–day limit of 42 U.S.C. § 2000e–5(e). On May 24, 1973, Streams received a right to sue letter from the EEOC, and, on July 25, 1973, well within the 90–day limit for initiating a federal suit, the district court granted the teachers' motion to amend the complaint to reflect the Title VII cause of action. The Board contended below that the district court lacked Title VII jurisdiction because the right to sue letter received by Streams was issued by the EEOC rather than the Attorney General, as required by 42 U.S.C. § 2000e–5(f)(1). Whatever the merits of this contention, the fact that the wrong agency issued the initial right to sue letter is not dispositive, for on August 2, 1974,

Streams, Marion Davis and Clanton received right to sue letters from the Attorney General, and under established law, this subsequent issuance of proper right to sue letters cured any defect that existed with respect to the original right to sue letter. *See Berg v. Richmond Unified School District*, 528 F.2d 1208, 1212 (9th Cir. 1975), *vacated on other grounds*, 434 U.S. 158, 98 S.Ct. 623, 54 L.Ed.2d 375 (1977); *Henderson v. Eastern Freight Ways, Inc.*, 460 F.2d 258 (4th Cir. 1972), *cert. denied*, 410 U.S. 912, 93 S.Ct. 976, 35 L.Ed.2d 275 (1973). *See also* cases compiled and discussed in 2 A. Larson & L. Larson, *Employment Discrimination* § 49.32, at 9B–30,–31 (1980).

Finally, we reject the argument made by the Board below that the district court lacked jurisdiction over the claims of the teachers who did not file charges with the EEOC or receive right to sue letters. It is established in this Circuit that when one or more of the original plaintiffs have satisfied the requirements of filing a charge with the EEOC and filing suit within 90 days of receipt of the right to sue letter, similarly situated plaintiffs may remain in the suit and recover backpay though they themselves failed to do so, *see Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498 (5th Cir. 1968), and this is true even though class certification has been denied, *see Wheeler v. American Home Products Corp.*, 582 F.2d 891, 897–98 (5th Cir. 1977).

an otherwise facially neutral plan or classification is to discriminate against members of one class or another," 429 U.S. at 137, 97 S.Ct. at 408, and assumed *arguendo* that a showing of discriminatory intent is not required to establish a violation of § 703(a)(1). The Court nevertheless held that the plan did not have a discriminatory effect on women because there was no evidence that the total "package" of benefits under the disability plan was worth more to men than to women. The exclusion of pregnancy from the disability plan was found not to constitute gender-based discrimination under Title VII.

One year later, the Supreme Court held in *Satty* that an employer's policy of denying employees returning from pregnancy leave their accumulated seniority constituted gender-based discrimination violative of § 703(a)(2) of Title VII. Citing *Gilbert*, the Court treated the seniority policy as neutral on its face in its treatment of male and female employees. However, the Court found that the seniority policy contravened § 703(a)(2) because it had the effect of discriminating against women. The *Satty* court distinguished *Gilbert* in the following passage:

> In *Gilbert, supra*, there was no showing that General Electric's policy of compensating for all non-job-related disabilities except pregnancy favored men over women. No evidence was produced to suggest that men received more benefits from General Electric's disability insurance fund than did women; both men and women were subject generally to the disabilities covered and presumably drew similar amounts from the insurance fund. We therefore upheld the plan under Title VII. . . .
>
> Here, by comparison, petitioner has not merely refused to extend to women a benefit that men cannot and do not re-

ceive, but has imposed on women a substantial burden that men need not suffer. The distinction between benefits and burdens is more than one of semantics. We held in *Gilbert* that § 703(a)(1) did not require that greater economic benefits be paid to one sex or the other "because of their differing roles in 'the scheme of human existence,'" 429 U.S., at 139, 97 S.Ct. at 410 n.17. But that holding does not allow us to read § 703(a)(2) to permit an employer to burden female employees in such a way as to deprive them of employment opportunities because of their different role.

434 U.S. at 141–42, 98 S.Ct. at 350–51 (footnote omitted).

Though the Court's opinion in *Satty* left many questions unanswered with respect to when a pregnancy-based classification constitutes gender-based discrimination violative of Title VII,[14] *Satty* stands for two propositions that are dispositive of this case: (1) a pregnancy-based classification, though neutral on its face, violates § 703(a)(2) of Title VII when its effect is to discriminate on the basis of sex and no showing of sex-based intent is required; and (2) a pregnancy-based classification that has the effect of depriving women of "employment opportunities" or of "adversely affect[ing] [their] status as an employee" "impose[s] on women a substantial burden that men need not suffer," 434 U.S. at 142, 98 S.Ct. at 351, and, therefore, constitutes sex-based discrimination violative of § 703(a)(2) of Title VII.

The district court erred by requiring the teachers to prove, as a part of their prima facie case, that the pregnancy-based classification embodied in the Board's reinstatement policy was a pretext designed to work an invidious discrimination against women. When an employment policy is neutral on its face, proof of pretext must be

---

14. *See, e. g., Satty*, 434 U.S. at 153–57, 98 S.Ct. at 357–59 (Stevens, J., concurring) (expressing concern that the Court's explanation of the legal distinctions between the policies at issue in *Gilbert* and *Satty* "may engender confusion," and suggesting a "pragmatic" basis for reconciling the two decisions); C. Sullivan, M. Zim-

mer & R. Richards, *Federal Statutory Law of Employment Discrimination* 152–54 (1980); Comment, *Differential Treatment of Pregnancy in Employment: The Impact of General Electric Co. v. Gilbert and Nashville Gas Co. v. Satty*, 13 Harv.Civ. Rights-Civ.Lib.L.Rev. 717 (1978).

shown as part of the prima facie case in order to satisfy the intent requirement of the equal protection clause. But when a facially neutral employment practice is challenged under § 703(a)(2), proof of pretext is unnecessary because sex-based intent is not an element of the prima-facie case.[15] *Satty* necessarily stands for this proposition, for the *Satty* Court imposed liability under § 703(a)(2) solely on the basis that the facially neutral pregnancy-based seniority policy had a discriminatory impact on women. This case plainly falls within the scope of § 703(a)(2), for the teachers' claim is that the Board's reinstatement policy deprived them of employment opportunities and affected their status as employees by preventing their return to work for varying periods of time. Therefore, the district court erred by dismissing the teachers' claim on the ground that they failed to prove intent to discriminate against women.

◼ Based on the facts as found by the district court, we have no difficulty in deciding that as a matter of law the reinstatement provisions of the Board's maternity leave policy as applied to the teachers constituted actionable sex discrimination under § 703(a)(2). The teachers proved that the Board's reinstatement policy discriminated on the basis of pregnancy by vesting discretion in the Superintendent to determine when a teacher could return from maternity leave while granting the Superintendent no concomitant discretion with respect to teachers returning from sick leave. The teachers also proved that the Board's failure to reinstate the teachers did not involve a mere withholding of potential benefits that "men cannot and do not receive," 434 U.S. at 142, 98 S.Ct. at 351; rather, it plainly constituted a denial of employment opportunities. And because the Board's reinstatement policy denied employment opportunities on the basis of pregnancy, under the rationale of *Satty* it "imposed on women a substantial burden that men need not

suffer." 434 U.S. at 142, 98 S.Ct. at 351. It follows that absent a business justification, the Board's refusal to reinstate the teachers constituted an unlawful employment practice under § 703(a)(2) of Title VI. *See Harper v. Thiokol Chemical Corp.*, 619 F.2d 489 (5th Cir. 1980) (employer's policy of requiring women who had been on pregnancy leave to have sustained a normal menstrual cycle before they could return to work constituted unlawful sex discrimination); *In re Southwestern Bell Telephone Co. Maternity Benefits Litigation*, 602 F.2d 845, 849 (8th Cir. 1979) (employer's policy of guaranteeing reinstatement to job position held prior to leave to employees returning from disability leave other than pregnancy, while failing to guarantee reinstatement to female employees returning from maternity leave violated Title VII); *Pennington v. Lexington School District*, 578 F.2d 546, 548–49 (4th Cir. 1978) (employer's reinstatement policy requiring physically fit female teachers to remain on leave for an entire school year after pregnancy while allowing employees absent for other disabilities to return to work constitutes illegal sex discrimination absent business necessity); *cf. deLaurier v. San Diego Unified School District*, 588 F.2d 674, 684–85 (9th Cir. 1978) (employer's policy denying use of accumulated sick leave benefits for maternity leave violated Title VII by discriminating against female teachers on the basis of sex).

### (b) *Business Necessity*

Though the teachers proved that the Board's facially neutral reinstatement policy had the effect of depriving women of employment opportunities because of their sex, we must nevertheless consider whether the Board's refusal to reinstate the teachers was brought about by a "business necessity." Such a justification is a defense to Title VII liability. *See Satty*, 434 U.S. at 143, 98 S.Ct. at 352; *Dothard v. Rawlinson*, 433 U.S. 321, 331–32 n.14, 97 S.Ct. 2720,

---

**15.** In a Title VII case based on a claim of discriminatory impact, proof of pretext is required only if the employer, in its rebuttal of the plaintiff's prima facie case, establishes a business necessity or job-relatedness defense.

*See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). *See also* C. Sullivan, M. Zimmer & R. Richards, *Federal Statutory Law of Employment Discrimination* 33–34, 58–60 (1980).

2727–28 n.14, 53 L.Ed.2d 786 (1977); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The Board argues that its refusal to reinstate the teachers was necessary because no vacancies in teaching positions existed at the time the teachers sought to return and the school district could not afford to bear the cost of keeping the teachers on relief status.[16] In evaluating this claim, it is important to understand that lack of vacancies, standing alone, does not explain the Board's refusal to reinstate the teachers to the district's payroll, since it is also true that no vacancies existed for the 340 other teachers who were allowed to remain on the payroll as relief teachers. At most, the "lack of vacancies" argument explains why teachers who had been on maternity leave were not reinstated to particular teaching positions; it offers no explanation of why teachers who had been on maternity leave were not reinstated to relief positions. The Board's bottom-line argument is an economic one: although those teachers who were "on hand" were kept on as relief teachers, the district simply could not afford to pay any additional salaries to teachers for whom no teaching posts were available.

■ We need not consider whether the business necessity defense applies to these facts, for even if the asserted economic justification for the Board's actions falls within the scope of the doctrine, we find that the Board's own admissions effectively rebutted its defensive theory. When an employer has defended its discriminatory employment practice on the ground of business necessity, the employee may rebut the employer's showing with proof that the stated business necessity is a pretext for discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425–26, 95 S.Ct. 2362, 2375–76, 45 L.Ed.2d 280 (1975). Pretext may be proved by showing that less discriminatory alternatives to achievement of the employer's goal were available. *Id.* at 425,[17] 95 S.Ct. at 2375. By the Board's own admission, achievement of its fiscal objectives did not require it to utilize pregnancy as a basis for determining which teachers would remain on the district's payroll. Rather, a number of less discriminatory alternatives existed. As the Board conceded at oral argument, teacher and relief positions could have been filled on the basis of seniority or other objective factors. Likewise, the Board could have laid off any number of teachers it felt necessary by random selection. Moreover, a policy of deferring the return of *all* teachers on leave, both those who had been pregnant and those who had suffered from other temporary disabilities, would have saved the Board more money than the discriminatory policy it utilized. In view of the availability of these nondiscriminatory alternatives, the Board's attempt to establish a business necessity defense fails as a matter of law.

### (c) *Backpay*

■ Having carried their "ultimate burden of proving a violation of Title VII," *New York City Transit Authority v. Beazer*, 440 U.S. 568, 587, n.31, 99 S.Ct. 1355, 1366 n. 31, 59 L.Ed.2d 587 (1979), the teachers are entitled to an award of backpay to compensate them for the economic loss they sustained as a result of the Board's discrimination. 42 U.S.C. § 2000e–5(g); *Merriweather v. Hercules, Inc.*, 631 F.2d 1161, 1167 (5th Cir. 1980); *Marks v. Prattco, Inc.*, 607 F.2d 153, 1155 (5th Cir. 1979). The district court correctly found that each of the five teachers gave the Board timely notice of her

---

**16.** We note that the Board has raised the business necessity defense in only a limited context. The Board merely seeks to justify its refusal, under the circumstances, to reinstate the teachers. The Board has never attempted to justify its discriminatory reinstatement *policy* on business necessity grounds.

**17.** The employee's proof that less discriminatory alternatives to reaching the employer's goal exist also serves directly to rebut the employer's claim that its discriminatory action was *necessary* to its business. *See Burwell v. Eastern Air Lines, Inc.*, 633 F.2d 361, 372–73 (4th Cir. 1980) (en banc), *cert. denied*, —— U.S. ——, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981).

desire to return to teaching,[18] and that the economic loss suffered by each teacher was therefore due solely to the Board's discrimination. The court derived the amount of backpay due by calculating the amount of each teacher's lost earnings during the period from the time she desired to return and was fit to teach to the time of her reinstatement. Since the Board does not take issue with the amount of the backpay award, we affirm the award as computed by the district court.

#### B. The Backpay Award Against the Individual Defendants

 The district court held both the Board and the individual defendants liable for backpay under § 1983 based upon its finding of a constitutional violation. We have held that the district court erred in holding that the Board's maternity leave policy established an irrebuttable presumption violative of the due process clause. However, finding that the Board's policy violated Title VII, we have held that the Board is liable for backpay. The question of the liability of the individual defendants nevertheless remains. Personal liability, if any, of the individual defendants must be predicated upon a constitutional violation under § 1983, for we find no authority for holding public officials personally liable for backpay under Title VII.[19] Moreover, any

---

**18.** We affirm the district court's finding that each of the five teachers gave timely notice of intent to return to teaching. The Board concedes that three of the five teachers who prevailed below—Verna Jones, Yvette Monette and Kathleen Wooten—met the June 1st deadline. The Board argues that Clanton failed to comply with the deadline because she indicated her intent to return on the back of her application for maternity leave, which was filed April 17, 1972, several months before her baby was born. The Board admitted at oral argument that although teachers usually filed the doctor's certificate of fitness at the same time they notified the Board of their intent to return, the two requirements of notice and a doctor's certificate were separate, and that there was no requirement that the doctor's certificate accompany the notice. The Board also admitted that no particular form of notice was required. And the Board does not dispute that the language used by Clanton on the back of the form adequately conveyed her intent to return. The real problem, as was conceded by the Board at oral argument, was that the district simply failed to spot Clanton's notice on the back of the form. Under these circumstances, we affirm as not clearly erroneous the district court's judgment that Clanton met the June 1st deadline. Finally, we affirm the district court's finding that the remaining plaintiff, Zeola Kelly, gave timely notice. Kelly gave notice on November 10, 1972, well after the June 1st deadline. However, the record clearly shows that Kelly was not subject to the deadline; rather, her reinstatement was governed by an "interim policy" adopted by the Board, along with its new policy, on January 9, 1973. Under this interim policy, all teachers on maternity leave as of the date of adoption of the policy, regardless of whether or not they had given notice before June 1st, were to be reinstated as soon as vacancies were available and in no case later than one semester after they notified the Board

of their intent to return. Since the Board thus waived the requirement of notice by June 1st, it cannot now claim that Kelly's economic loss was caused by her failure to meet the deadline rather than by its own illegal conduct.

Since we affirm the district court's finding that each of the five teachers gave timely notice, we need not consider whether the June 1st deadline, which was applicable only to teachers on maternity leave, constituted a prima facie violation of Title VII and if so, whether it was justified as a business necessity.

**19.** 42 U.S.C. § 2000e–5(g) specifies that backpay awards are "payable by the *employer*, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice." (Emphasis added). We agree with the Second Circuit that there is "no statutory warrant for such an award against a public official" in his individual capacity. *See Monell v. Department of Social Services*, 532 F.2d 259, 261 (2d Cir. 1976) (dictum), *rev'd on other grounds*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Indeed, our research has failed to uncover a single case in which a public official has been held personally liable for backpay under Title VII. *But cf. Hutchison v. Lake Oswego School District*, 519 F.2d 961, 968 (9th Cir. 1975), *vacated and remanded on other grounds*, 429 U.S. 1033, 97 S.Ct. 725, 50 L.Ed.2d 744 (1977) (holding defense of qualified immunity available in Title VII suit for backpay against individual school board members; specific issue whether Title VII authorizes backpay awards against such officials neither raised nor decided).

We note that the language of § 2000e–5(g) making "employer[s]" responsible for backpay is readily distinguishable from the language of § 1983, which provides a cause of action against "[e]very person" who, under color of law, deprives any citizen or person within the jurisdiction of the United States of a constitutional or federal statutory right.

such personal liability must be based on constitutional grounds other than the irrebuttable presumption doctrine because we have found no irrebuttable presumption in this case. We need not go on to consider the constitutionality of the Board's policy, just to determine if there is individual liability. We find that even if the policy was unconstitutional, in addition to being in violation of Title VII, the individual defendants cannot be held personally liable for backpay because they established the defense of qualified immunity as a matter of law.

The basis for the district court's imposition of personal liability for backpay on the individual defendants was its rejection of their asserted § 1983 defense of qualified immunity. Under *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) and its progeny, there are "two components to the qualified immunity defense, one subjective and one objective." *Fowler v. Cross,* 635 F.2d 476, 482 (5th Cir. 1981); *see also Bogard v. Cook,* 586 F.2d 399 (5th Cir. 1978), *cert. denied,* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979). Under the subjective test, an official is not entitled to the defense if he acts "with the malicious intention to cause a deprivation of constitutional rights or other injury" to the plaintiff. *Wood,* 420 U.S. at 322, 95 S.Ct. at 1000; *Fowler,* 635 F.2d at 482. Under the objective test, a public official "is not immune from liability ... if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights" of the plaintiff. *Wood,* 420 U.S. at 322, 95 S.Ct. at 1000. Though this test requires public officials to be aware of the legal rights of persons who are affected by their actions, it does not charge officials " 'with predicting the future course of constitutional law.' " *Wood,* 420 U.S. at 322, 95 S.Ct. at 1000, quoting *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967). The constitutional rights at issue must have been "clearly established" at the time the official acted in order to hold him personally liable. *Wood,* 420 U.S. at 322, 95 S.Ct. at 1000; *see Procunier v. Na-*

*varette,* 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978); *Fowler,* 635 F.2d at 482–83.

The district court found that the individual defendants acted without malice and in subjective good faith in establishing and implementing the maternity leave policy, and we affirm that finding as amply supported by the record. The district court further held, however, that the individual defendants were liable because they should have known that their actions violated the constitutional rights of the teachers, citing *Vlandis v. Kline,* 412 U.S. 441, 446, 93 S.Ct. 2230, 2233, 37 L.Ed.2d 63 (1973), for the proposition that "permanent irrebuttable presumptions have long been disfavored under the Due Process Clause . . . ."

The individual defendants contend that the constitutional rights of the teachers were not clearly established at the time they acted (late 1972) and that the district court therefore erred in holding them personally liable for backpay. Their argument on this issue, like the opinion of the district court, focuses solely on the question whether the illegality of *irrebuttable presumptions* was clearly established in 1972. But our holding that the Board's maternity leave policy did not establish an irrebuttable presumption of unfitness to teach makes irrelevant the question whether irrebuttable presumptions were clearly illegal in 1972. We must now focus on the question whether it was clearly established in 1972 that the Board's maternity leave policy as applied to the teachers violated their right to equal protection or due process in some way other than by establishing an irrebuttable presumption of unfitness to teach. We emphasize that we need not determine whether the Board's policy is illegal under current law; we need only decide whether the law as it existed in 1972 had clearly established that such a policy was unconstitutional.

We hold that as a matter of law the teachers' right to be free from the type of maternity leave regulations involved in this case was not clearly established in 1972.

Our research has revealed that the application of the due process and equal protection clauses to the area of pregnancy-based classifications is a relatively recent phenomenon. Until *LaFleur*, which was decided in 1974, the Supreme Court had never suggested that restrictive maternity leave regulations might be unconstitutional. Though the Courts of Appeals had decided some cases before 1973 involving pregnancy-based classifications, neither party has cited nor has our research revealed a single pre-1973 case invalidating maternity leave return provisions similar to those involved in this case. Moreover, no case cited by the parties or of which we are aware raised the "vacancies" issue presented here. Neither of the two Fifth Circuit cases which dealt with pregnancy classifications before

1973—*Jinks v. Mays*, 464 F.2d 1223 (5th Cir. 1972); and *Schattman v. Texas Employment Commission*, 459 F.2d 32 (5th Cir. 1972)—involved policies analogous to the Board's. Under these circumstances, it is plain that the constitutional rights of the teachers cannot fairly be said to have been clearly established in 1972. Since the individual defendants are thus entitled as a matter of law to the qualified immunity defense, the portion of the district court's order holding them personally liable for backpay must be reversed.[20]

### C. Attorneys' Fees

The final contention of the Board and individual defendants is that the district court abused its discretion in granting the

---

**20.** The teachers contend that the qualified immunity defense is limited to the context of legal remedies (i. e., money damages) and that it is unavailable with respect to all equitable relief, including backpay. Assuming arguendo that the backpay remedy in this case (which does not include reinstatement) can fairly be characterized as equitable, we reject the asserted distinction between equitable and legal relief for purposes of the qualified immunity defense.

Though § 1983 "creates a species of tort liability that on its face admits of no immunities," *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976), *quoted in Owen v. City of Independence*, 445 U.S. 622, 634, 100 S.Ct. 1398, 1407, 63 L.Ed.2d 673 (1980), and though § 1983 is "intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights," *Monell v. Department of Social Services*, 436 U.S. 658, 700–01, 98 S.Ct. 2018, 2040–41, 56 L.Ed.2d 611 (1978), the Supreme Court, in a series of decisions, established the qualified immunity defense in recognition that "overriding considerations of public policy nonetheless demanded that the [government] official be given a measure of protection from personal liability," *Owen*, 100 S.Ct. at 1416. Those decisions identified three primary considerations that justified the creation of a qualified immunity defense from personal liability for public officials: the injustice of subjecting to liability an officer whose position requires the exercise of discretion; the danger that imposition of personal liability could have a chilling effect on the exercise of the officer's decision-making responsibilities; and the fear that the threat of personal liability might deter citizens from holding public office. See *Owen*, 100 S.Ct. at 1416–17; *Wood*, 420 U.S. at 317–22, 95 S.Ct. at 998–1001; *Scheuer v. Rhodes*, 416 U.S. 232, 239–48, 94 S.Ct. 1683, 1687–92,

40 L.Ed.2d 90 (1974). Because each of these concerns focuses on the results flowing from imposition of personal monetary liability, and since backpay and damage remedies, regardless of their labels, are identical in the crucial respect that both require the payment of money, we are convinced that the reasons that led the Supreme Court to approve the qualified immunity defense in the context of legal damages mandate the recognition of that defense in the context of liability for backpay. See *Paxman v. Campbell*, 612 F.2d 848, 856 (4th Cir. 1980) (en banc), *cert. denied*, —— U.S. ——, 101 S.Ct. 951, 67 L.Ed.2d 117 (1981); *cf. Shirley v. Chagrin Falls Board of Education*, 521 F.2d 1329, 1334 (6th Cir. 1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976) (defense of qualified immunity is available in context of backpay action since "where the action is against the individual members of the Board, it is in effect an action for damages, whether it is styled as such or not").

We note that this holding will not leave innocent victims of constitutional violations committed by city officials without a remedy for their loss of earnings. Municipal bodies are "persons" within the meaning of § 1983, *Monell*, 436 U.S. at 690, 98 S.Ct. at 2035, and it is now settled that municipal bodies have no immunity from liability under § 1983 and may not assert the good faith of their officers as a defense to § 1983 liability, *Owen*, 100 S.Ct. at 1398. Therefore, a plaintiff who successfully establishes that a constitutional violation was committed by a municipal officer "whose edicts or acts may fairly be said to represent official policy," *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037, will be able directly to recover monetary relief, including backpay, from the municipality.

teachers an attorneys' fee award of $24,-514.70. The defendants do not contest the district court's finding that the teachers were "prevailing parties," nor do they contend that the case involved special circumstances that would bar an award of attorneys' fees altogether. Rather, their sole objection is to the amount of the fee award.[21] They assert that the award was too high in light of the relatively small backpay award (a total of $8,654.16) and in light of the amount of time spent on the prosecution of unsuccessful claims and preliminary motions.

In reviewing an attorneys' fee award for reasonableness, our task is limited to determining whether the district court abused its discretion. *See, e. g., Harkless v. Sweeny Independent School District,* 608 F.2d 594 (5th Cir. 1979); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir. 1974). "This determination rests upon a careful review of the basis upon which the district court made its award," *Davis v. City of Abbeville,* 633 F.2d 1161, 1163 (5th Cir. 1981), including its evaluation of the case in terms of each of the *Johnson* criteria.[22]

In this case, the district judge thoroughly and carefully applied each of the *Johnson* criteria. In computing the amount of the fee award, the district court first determined the amount of the customary hourly fee in the New Orleans area for both junior and senior attorneys for each year in which the litigation took place. Because of the complexity of the case, the court then added a premium for each junior attorney of $5.00 for the years 1972–75 and $10.00 for the years 1976–78. The total amount of time spent by counsel for the teachers, 590.-10 hours, was documented and undisputed. The court then deducted 20% of the time spent on the case for each year in recogni-

tion of the fact that some of the plaintiffs were not prevailing parties and that some of the relief sought was not obtained. The resulting number of hours for each year was multiplied by the relevant hourly fee and the yearly subtotals were added, which resulted in a total figure of $24,514.70. The court specifically considered the relatively small amount of the recovery, holding that while the amount obtained did not warrant any extra compensation, "the attorneys should not be penalized because a vigorous defense made necessary a long, arduous and skillful prosecution of the plaintiffs' claims." The quality of the services performed by counsel for the teachers was found to be exceptional. The court then addressed the remainder of the *Johnson* criteria and found that, under the circumstances of the case, none of the criteria called either for a deduction from or an addition to the amount of the award.

We perceive no abuse of discretion in the district court's determination of a reasonable fee in this case. The court did not err by refusing to reduce the amount of the award in light of the relatively small amount of backpay recovery. The court properly recognized that the amount of recovery is only one of many relevant factors in determining a reasonable fee, and properly inquired whether the effort expended by counsel for the teachers was necessary to pursue the case in all its facets. Nor did the court err in its treatment of the issue of compensation for unsuccessful claims. In *Jones v. Diamond,* 636 F.2d 1364 (5th Cir. 1981) (en banc), we articulated the appropriate standard for determining a proper attorneys' fee award in a situation in which plaintiffs have been only partially successful:

Time spent pursuing unsuccessful claims that were clearly without merit should be

---

21. The district court also awarded the teachers costs of $1,165.77. The defendants do not take issue with the amount of this award.

22. Since both 42 U.S.C. § 1988 and Section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k), authorize awards of reasonable attorneys' fees to the "prevailing party," and since the *John-*

*son* criteria govern the granting and review of fee awards under both statutes, *see Davis v. City of Abbeville,* 633 F.2d 1161 (5th Cir. 1981) (§ 1988); *Johnson,* 488 F.2d 714 (§ 2000e–5(k)), it is of no significance to this appeal that the district court assessed fees under § 1988 rather than under § 2000e–5(k).

excluded. However, the mere fact that the litigants did not succeed in obtaining a judgment on all of the claims asserted does not mean that time spent pursuing these claims should automatically be disallowed.... Instead the court must consider the relationship of the claims that resulted in judgment with the claims that were rejected and the contribution, if any, made to success by the investigation and prosecution of the entire case.

*Id.* at 1382 (citations omitted). Here, the district court carefully conducted such an inquiry. The district court's opinion reflects its recognition that although some of the teachers' preliminary motions and requests for relief were unsuccessful and only five of the plaintiffs won backpay awards, some of the time spent on these unsuccessful claims contributed to the development of claims that were successful. After reviewing the entire record, we are confident that the deduction of 20% of the total time spent on the case representing the effort expended on unsuccessful claims is fair and reasonable. We note that the 20% figure used by the district court is very close to the 25% figure suggested by the defendants in their brief to the district court on the issue of attorneys' fees.

Finally, we find the district court was justified in awarding a small hourly premium in recognition of the complexity of the case. Under *Johnson,* the novelty and difficulty of the questions presented by the litigation must be taken into account, and the fee may be adjusted accordingly in an appropriate case. The district court properly identified this as such a case, and the amount of the adjustment is reasonable.

In affirming this fee award, we emphasize our conviction that the amount of the award, though seemingly high when viewed solely from the standpoint of the amount of

backpay recovery, is well within the bounds of reasonableness when viewed in light of the seven years between the filing of the original complaint and the judgment below and the difficult and evolving nature of the legal issues involved. Finding no abuse of discretion, we affirm the award of attorneys' fees and costs as determined by the district court.[23] However, we must reverse the assessment of attorneys' fees and costs against the individual defendants, since the finding that they established the defense of qualified immunity forecloses their personal liability for attorneys' fees. *Familias Unidas v. Briscoe,* 619 F.2d 391, 406 (5th Cir. 1980).

## IV. CONCLUSION

To summarize, we find that the maternity leave return to work policy constituted illegal sex-based discrimination under Title VII, and we affirm the district court's imposition of liability for backpay on the Board. We find the district court in error in holding that the return provisions of the Board's maternity leave policy established an unconstitutional irrebuttable presumption of unfitness to teach for the period of the maternity leave. With respect to the judgment of the district court holding the individual defendants liable for backpay we reverse, finding as a matter of law they were entitled to claim the defense of qualified immunity. Finally, we affirm the district court's award of attorneys' fees and costs against the Board, but reverse the fee award against the individual defendants.

AFFIRMED IN PART, REVERSED IN PART.

---

**23.** The defendants also complain of the absence in the record of any evidence supporting the district court's determination of the amount of customary hourly fees. The thrust of the argument seems to be that the court fell into error by drawing upon its own experience in litigation in the New Orleans area as a guide for computing the customary hourly fee. Assuming arguendo that there was no other record evidence to support the district court's determination of customary hourly fees, the defendants are not entitled to a modification of the fee award since they failed to object below to the district court's figures and have presented nothing on appeal which remotely suggests that the figures adopted by the district court were unreasonable.