**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF ALASKA, Office of the
Governor,
                    *Petitioner,*

            v.                              No. 07-70174

EEOC; UNITED STATES OF
AMERICA,                                    OPINION
                    *Respondents,*

MARGARET G. WARD,
                    *Intervenor.*

Petition for Review of an Order of the
United States Equal Employment Opportunity Commission

Argued and Submitted
August 7, 2007—Anchorage, Alaska

Filed November 8, 2007

Before: J. Clifford Wallace, John T. Noonan, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Noonan;
Concurrence by Judge Wallace;
Dissent by Judge Paez

14707

**COUNSEL**

Richard W. Postma, Jr., Anchorage, Alaska, for the petitioner.

Stephanie Marcus, Washington, D.C., for the respondents.

**OPINION**

NOONAN, Circuit Judge:

The State of Alaska, Office of the Governor (the Governor's Office) appeals the remand order of the United States

Equal Employment Opportunity Commission (the EEOC) in a suit against the State of Alaska brought by two discharged members of the Governor's Office. We hold that the suit is barred by the Eleventh Amendment and direct its dismissal.

FACTS AND PROCEEDINGS

In the election of November 1990, Governor Walter Hickel ran for reelection with Jack Coghill as his running mate for Lieutenant-Governor. Hickel and Coghill were elected. In a gesture to his ideologically-different running mate, Hickel appointed Margaret Ward (Ward) to be Director of the Office of the Governor in Anchorage and appointed Lydia Jones (Jones) to be one of his Special Staff Assistants in the same office. Both positions were exempt from civil service. Ward's responsibilities as set out by her included supervision of "all operations of Governor's Anchorage Regional Office, including personnel. Promote the goals and agenda of Governor Hickel and his administration." Jones' responsibilities, as set out in a staff description of the position, included response to the voluminous correspondence addressed to the governor and the handling of 350 to 450 telephone calls per day. The Special Assistants were expected to give "a friendly ear or helping hand for a constituent" and to be advocates of the governor's programs in the legislature or with the public. The job description concluded: "It is a position of political sensitivity demanding ever-changing priorities and the flexibility to handle almost any type of problem."

During his term of office, Lieutenant-Governor Coghill took steps to be able to run for governor in the 1994 election. By midsummer 1993, Ward was believed to be assisting his forthcoming campaign. The Governor's Office suspected that Jones was assisting her. As a consequence of these suspicions, the Chief of Staff of the Governor's Office directed the Director of Administrative Services to issue a memorandum to all senior staff in the Governor's Office. Issued on September 23, 1993, the memo advised the senior staff of the legal limits on

any campaign activities by them. On February 10, 1994, Ward received a warning against continuing her rumored campaign conduct. The next day, February 11, 1994, Ward reported to the Governor's Office that Jones was complaining about sexual harassment. On February 15, 1994, the Governor's Office ordered an investigation. On March 11, 1994, Ward and Jones held a press conference in which they criticized Governor Hickel. They were at once placed on administrative leave. On April 22, 1994, when the Governor's Office investigation was completed, their employment was terminated because of their alleged election activities.

On April 25, 1994, the Governor's Office was served with complaints to the EEOC by Jones and Ward. Jones' complaint alleged that she had suffered sexual harassment by a male Special Staff Assistant and that she had been paid less than her male counterparts because of her gender and her race (black). Ward alleged that she had suffered sex discrimination and retaliatory discrimination. Filed as charges under Title VII of the Civil Rights Act, the charges were classified by the EEOC as falling under the Government Employee Rights Act (GERA). The case lay dormant until January 15, 2003.

Before the EEOC reopened the case, Jones died. Her widower, Kenneth Miller, alleged that he stepped into her shoes. The Governor's Office, pleading immunity under the Eleventh Amendment and assorted other defenses, moved for summary judgment. On January 4, 2005, an Administrative Law Judge denied summary judgment on the other defenses, but doubted if he had jurisdiction to rule on immunity under the Eleventh Amendment and so made no ruling on this defense, certifying it to the EEOC itself. On December 14, 2006, the EEOC ruled that "an agency will not rule on the constitutionality of a statute that it is assigned to administer." The EEOC remanded the case to the ALJ.

The Governor's Office appeals.

ANALYSIS

Ordinarily we do not have jurisdiction to review an order that is not final. Such is the EEOC's order of remand. But there are exceptions, and this case is one. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993) (holding that an order denying a State's claim to Eleventh Amendment immunity is an appealable collateral order). We proceed to examine the merits of the immunity asserted by the Governor's Office.

Amendment XI to the Constitution of the United States, adopted in 1798, reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Almost a century later the Supreme Court of the United States expanded the extent of the immunity conferred on the States by adding citizens of the same State to the category of potential plaintiffs disabled from pursuing a remedy for a wrong alleged to have been committed by the State. *Hans v. Louisiana*, 134 U.S. 1 (1890).

**[1]** The Eleventh Amendment textually poses no barrier to a suit by the United States or an agency of the United States against a State. But in 2002, it was held that the immunity of a State "extends beyond the literal text of the Eleventh Amendment." *Fed. Mar. Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 754 (2002). The Supreme Court remarked that "we cannot imagine" that the Framers would have found it acceptable to compel a State to answer the complaints of private parties that were channeled through a federal agency. *Id.* at 760. The dignity of a State would be compromised. *Id.* The EEOC is in no better position than the Federal Maritime Commission when it presents the complaint of two private persons.

**[2]** Amendment XIV, however, imposes obligations on the States. Section 5 of the amendment provides: "The Congress

shall have the power to enforce, by appropriate legislation, the provisions of this article." The Fourteenth thus trumps the Eleventh if Congress legislates to enforce the Fourteenth and the legislation is appropriate. The Supreme Court has set criteria for legislation to meet if the Supreme Court is to judge the legislation appropriate. The Court requires that Congress has "unequivocally expressed its intent to abrogate that immunity" and "acted pursuant to a valid grant of constitutional authority." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000).

In 1972, Congress held extensive hearings on discrimination in the treatment of the ten million or more employees of state and local governments. On the basis of these hearings, the relevant committees found extensive gender and racial discrimination by the States. See H.R. Rep. No. 92-238 (1971), *reprinted in* 1972 U.S.C.C.A.N. 2137, and S. Rep. No. 92-415 (1971). The reported instances of discrimination appeared to be across the board. No special mention, one way or the other, was made of highly-placed employees serving in posts close to the governor of a State. As enacted in 1972, the Equal Employment Opportunity Act based on the hearings excluded from its protection elected officers and "any person chosen by such officer to be on such officer's personal staff" and employees "on the policymaking level" or serving the official as "an immediate adviser with respect to the exercise of the constitutional or legal powers of the office." 42 U.S.C. § 2000e(f) (1972). The legislative history shows an acute awareness in the Senate of the undesirability of sweeping such key persons under the general prohibitions of discrimination. *See Gregory v. Ashcroft*, 501 U.S. 452, 491-92 (1991) (Blackmun, J., dissenting).

**[3]** In 1991, the Equal Employment Opportunity Act of 1972 was amended by GERA, 42 U.S.C. §§ 2000e-16a *et seq*. GERA wiped out the existing exemption of members of an elected official's personal staff, those serving the official on a policymaking level, and those serving as immediate advis-

ers. GERA was enacted with no findings by Congress as to state practices of discrimination against employees at this level of government. Without such findings was GERA a proportionate response to an identified evil? If not, GERA failed to meet the criteria set by the Supreme Court. *See City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).

The EEOC argues that the necessary findings had already been made in the hearings that preceded enactment of the Equal Employment Opportunity Act of 1972. The existence of widespread racial and sexual discrimination in state governments had been shown; the policymakers were not distinguished as different. If the findings were strong enough to sustain the Equal Employment Opportunity Act of 1972, they are, says the EEOC, strong enough to sustain GERA.

Does this piggyback work? The Governor's Office denies that it does. One substantial difficulty is that separate provisions of the same act may have different effects on Eleventh Amendment immunity. *Compare Tennessee v. Lane*, 541 U.S. 509 (2004) (holding that Title II of the Americans with Disabilities Act (ADA) validly abrogated state immunity as to cases involving the right of access to the courts) *with Bd. of Trs. of the Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001) (holding that Title I of the ADA did not validly abrogate state immunity as to the disabled alleging employment discrimination on account of their disability); *see also Garrett*, 531 U.S. at 360 n.1 ("We are not disposed to decide the constitutional issue whether Title II [of the ADA], which has somewhat different remedial provisions from Title I [of the ADA], is appropriate legislation under § 5 of the Fourteenth Amendment . . ."). What matters is the effect on Eleventh Amendment immunity that a particular provision has, not whether it amends or is part of another piece of legislation.

The Supreme Court has held that the Family and Medical Leave Act (FMLA) validly abrogated Eleventh Amendment immunity in part because, "of particular importance to the

States, the FMLA expressly excludes from coverage state elected officials, their staffs, and appointed policymakers." *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 739 (2003). *Hibbs* suggests that GERA's expansion of the class of covered employees changes the Eleventh Amendment analysis.

In the course of holding that the Age Discrimination in Employment Act did not disturb the immunity of Missouri's age limitation on judicial office, the Supreme Court observed:

> "It is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers . . . should be exclusive, and free from external interference, except so far as plainly provided by the Constitution of the United States." *Taylor v. Beckman*, 178 U.S. 548, 570-571, 44 L. Ed. 1187, 20 S. Ct. 890 (1900). See also *Boyd v. Nebraska ex rel. Thayer*, 143 U.S. 135, 161, 36 L. Ed. 103, 12 S. Ct. 375 (1892) ("Each State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen").

*Gregory*, 501 U.S. at 460.

**[4]** In 1972, Congress thought of state policymakers as different from other state employees, and so Congress specifically excluded them from coverage. The exclusion is at least an indication that the hearings did not establish an existing evil in the selection and retention of a governor's close associates. Nothing in the record shows that a pattern of gender discrimination as to a governor's staff, advisers, and policymakers existed in 1991 when GERA was enacted. The absence of such evidence is critical. Very few modern governors, it may fairly be assumed unless the contrary were shown, would intentionally discriminate on the basis of gender or race in choosing key advisers, and very few modern

governors who did discriminate would be likely to keep their office. It would be guesswork, unsupported by the record, to suppose that a widespread pattern of intentional discrimination on account of gender or race existed among the fifty governors of the states as they selected staff assisting them in the exercise of their office.

**[5]** No modern governor could run his government without the assistance of the sort provided in Alaska by the Director of the Governor's Office in Anchorage and by the Special Staff Assistants. Being a governor is not a one-person job. The governor acts by his policymaking assistants. To treat these assistants as subject to federal legislation is tantamount to holding that the highest elected official in a state is bound by GERA. We do not believe that GERA is a proportionate response to a widespread evil identified as the predicate of this legislation. Accordingly, we grant the Governor's Office's appeal and remand to the EEOC with directions to dismiss the suit.

Remanded to the EEOC with directions to dismiss the suit.

WALLACE, Circuit Judge, concurring:

The dissent reads like a law review outline of relevant law but it makes an assumption I cannot accept. I therefore concur in Judge Noonan's opinion.

In 1972, Congress made findings showing widespread discrimination among state employees. The proposed legislation, however, was amended to exclude certain high level employees. What can we know based on this fact?

What we *know* is that there was a record of discrimination in state employment generally but that Congress voted not to

extend the statute's coverage to certain high level state employees.

What the dissent *assumes* is that this was done for purely political reasons based on only a few representatives' concerns about state rights. It is true that two senators asserted this argument in support of the amendment. But that does not tell us the intent of hundreds of other lawmakers at the time of their votes.

This is the problem with basing assumptions on legislative history. As Justice Scalia has persuasively written:

> "[T]he use of legislative history . . . . is much more likely to produce a false or contrived legislative intent than a genuine one. The first and most obvious reason for this is that, with respect to 99.99 percent of the issues of construction reaching the courts, there *is* no legislative intent, so that any clues provided by the legislative history are bound to be false. Those issues almost invariably involve points of relative detail, compared with the major sweep of the statute in question. That a majority of both houses of Congress (never mind the President, if he signed rather than vetoed the bill) entertained *any* view with regard to such issues is utterly beyond belief. For a virtual certainty, the majority was blissfully unaware of the *existence* of the issue, much less had any preference as to how it should be resolved."

Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 31-32 (Amy Gutmann ed., Princeton University Press 1997)(emphasis in original).

The upshot is that we have an amended statute that excluded a certain segment of state employees from its coverage. There is no reliable history other than the face of the statute. Assumptions and speculation aside, there is no acceptable

way of knowing the reason each member of Congress voted. We know only that Congress chose to exclude a specific group despite general findings.

One may well and should applaud the Fourteenth Amendment as a way to attack state discrimination. But it must do so within constitutional limits. While the Fourteenth Amendment was an important constitutional amendment, it does not override the basic constitutional doctrine. The founders were cynical about governmental powers. The Constitution was not a rights-granting document (other than the right to patent) but was to limit government — that is, to protect the people from government. The Fourteenth Amendment does much, but it does not trump these fundamental safeguards.

Thus, Congress is not free to set aside "Our Federalism" beyond what adopted amendments permit. Here, Congress failed to do what the Constitution requires. Parties supporting GERA must show that there was a proper record justifying congressional action. Arguing by pointing to isolated statements in the legislative history that the 1972 exclusion was based on political concerns—and thereby implying that, those political concerns aside, Congress could have included high level state employees—will not do. In 1990, Congress could have made a record justifying the new expansion of the 1972 Act. This it failed to do. There are limitations even on Congress.

We do not know why Congress excluded high level state employees in 1972, and the 1990 Congress cannot simply shortcut its action by reference to the 1972 Act. It needed to take the time for hearings to develop an appropriate record. It is not that Congress cannot pass a statute such as GERA; it is that it must do so in a prescribed manner. Its failure to do so here requires the conclusion that the constitutional protections on state sovereign immunity have not been met. For this reason, I join the result advanced by Judge Noonan.

PAEZ, Circuit Judge, dissenting:

I would hold that Congress validly abrogated the States' Eleventh Amendment immunity to private claims for damages under the Government Employee Rights Act ("GERA"), 42 U.S.C. § 2000e-16a to 16c. I therefore respectfully dissent. Because the majority decides the Eleventh Amendment inquiry on narrow grounds, and because I disagree with its holding, I proceed to address the two predicate inquiries of the immunity analysis: congressional intent and constitutional authority. I turn first to congressional intent.[1]

## I.   Congressional Intent

To abrogate the States' Eleventh Amendment immunity, Congress must "unequivocally express[ ] its intent to abrogate that immunity." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000). In my view, Congress unequivocally expressed such an intent in GERA.

As the Supreme Court explained in 1976 in *Fitzpatrick v. Bitzer*, Title VII of the Civil Rights Act of 1964 expressly excluded the States from its purview. 427 U.S. 445, 448-49 & n.2. The 1972 amendments to Title VII,[2] however, "made clear that [Title VII] was being extended to persons aggrieved by public employers." *Id.* at n.2. With regard to the States, the 1972 amendments extended Title VII's protections to "employees subject to the civil service laws of a State government, governmental agency or political subdivision." 42 U.S.C. § 2000e(f). Conversely, the amendments excluded:

> any person elected to public office in any State or

---

[1]Because the underlying factual dispute is not at issue in this appeal, I do not quarrel with the majority's factual summary. I note, however, that the EEOC has yet to address the merits of Ward's and Jones' claims.

[2]Equal Employment Opportunity Act of 1972, Pub. L. 92-261, 86 Stat. 103, 42 U.S.C. § 2000e *et seq.*

> political subdivision of any State by the qualified
> voters thereof, or any person chosen by such officer
> to be on such officer's personal staff, or an appointee
> on the policy making level or an immediate adviser
> with respect to the exercise of the constitutional or
> legal powers of the office.

*Id.* The 1972 amendments also changed the definition of "respondent" to include government employers,[3] and thereby expressly subjected the States to private suits for damages by their employees. *See Fitzpatrick*, 427 U.S. at 448-49 & n.2; *Okruhlik v. Univ. of Ark.*, 255 F.3d 615, 623 (8th Cir. 2001).

*Fitzpatrick* therefore concluded that "congressional authorization to sue the State as employer" and "abrogate the immunity conferred by the Eleventh Amendment" was "clearly present" in the 1972 amendments. 427 U.S. at 451-52 (citation and internal quotation marks omitted); *see also Cerrato v. S.F. Cmty. Coll. Dist.*, 26 F.3d 968, 976 (9th Cir. 1994) ("The Supreme Court has held that Congress has abrogated the Eleventh Amendment with respect to Title VII claims."). The Court also held that Congress validly exercised its authority under § 5 of the Fourteenth Amendment in abrogating the States' Eleventh Amendment immunity, because Title VII as amended was " 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment." *Fitzpatrick*, 427 U.S. at 456.

Fifteen years after *Fitzpatrick*, Congress enacted GERA as part of the Civil Rights Act of 1991 ("1991 Act"), extending Title VII's protections to the state employees excluded from the 1972 amendments. The preamble to the 1991 Act states

---

[3]*See* 42 U.S.C. § 2000e(a) (defining "person" to include "governments, governmental agencies, [and] political subdivisions"); *id.* § 2000e(b) (defining "employer" to include, subject to certain conditions and exceptions, "a person engaged in an industry affecting commerce"); *id.* § 2000e(n) (defining "respondent" to include, *inter alia*, "an employer").

that it is "[a]n Act to *amend*" Title VII. Pub. L. No. 102-166, 105 Stat. 1071, 1071 (1991) (emphasis added); *see also Okruhlik*, 255 F.3d at 623 ("Although the 1991 Act is a separate statutory provision, the preamble makes clear that it was intended to amend Title VII."). Likewise, the text of GERA clarifies that it was intended to amend and extend Title VII. As originally enacted as Section 321 of the 1991 Act, GERA was titled "Coverage of *previously exempt* State employees." 105 Stat. at 1097 (emphasis added); *see also* 42 U.S.C. § 2000e-16c (GERA statutory provisions, as currently codified, with same title). GERA's definition of the covered state employees is also virtually identical to the text of the 1972 amendments that excluded these employees:

> [T]his title shall apply with respect to employment of any individual chosen or appointed, by a person elected to public office in any State or political subdivision of any State by the qualified voters thereof —
>
> > **(1)** to be a member of the elected official's personal staff;
> >
> > **(2)** to serve the elected official on the policymaking level; or
> >
> > **(3)** to serve the elected official as an immediate advisor with respect to the exercise of the constitutional or legal powers of the office.

42 U.S.C. § 2000e-16c(a). As the Tenth Circuit explained in *Board of County Commissioners, Fremont County, Colorado v. EEOC ("Fremont County")*: "In 1991, Congress enacted GERA, and extended protections against discrimination to previously exempt state employees. In so doing, Congress echoed the exclusionary language of Title VII, specifically extending protections against discrimination . . . to previously

exempt high-level state employees." 405 F.3d 840, 844 (10th Cir. 2005); *see also Brazoria County, Tex. v. EEOC*, 391 F.3d 685, 689-90 (5th Cir. 2004) (explaining that the GERA provision that prohibits discrimination on the basis of race or sex, 42 U.S.C. § 2000e-16b(a)(1), uses language identical to and expressly incorporates the meaning of the Title VII section that protects most federal employees, *id.* § 2000e-16).

For these reasons, at least one of our sister circuits has determined that GERA should be understood as amending and extending Title VII. *See Fremont County*, 405 F.3d at 849 ("GERA was the last step in the sequence of broadening Title VII to provide protections to state employees . . . . In passing the 1972 Title VII amendments and continuing through GERA as part of the Civil Rights Act of 1991, Congress provided an expanding class of state employees with what Congress found were necessary protections from discrimination.").

In light of these considerations, there can be no serious doubt that Congress expressed its unequivocal intent in GERA to abrogate the States' Eleventh Amendment immunity. Because the 1991 Act and GERA effectively amended Title VII and extended its protections to certain previously excluded state employees, Congress, in my view, must have intended GERA to incorporate the 1972 amendments' express inclusion of state employers as possible respondents to private Title VII claims for damages and the Supreme Court's 1976 holding that the 1972 amendments therefore validly abrogated the States' Eleventh Amendment immunity. *Cf. Fremont County*, 405 F.3d at 845 ("We assume that Congress knows the law and legislates in light of federal court precedent.").

The Eighth Circuit's decision in *Okruhlik* strongly supports this conclusion. In *Okruhlik*, the court rejected the defendant state university's argument that "claims of disparate treatment and disparate impact discrimination under Title VII . . . are barred by the Eleventh Amendment . . . because [Congress]

did not make an unmistakably clear expression of its intent to [abrogate the States' Eleventh Amendment immunity] in the 1972 Act or in the 1991 Act." 255 F.3d at 621-22. As the Eighth Circuit explained: "Subsequent to *Fitzpatrick*, this court has consistently held that the 1972 and 1991 Acts abrogated the Eleventh Amendment. Other circuits have reached the same conclusion based on *Fitzpatrick*." *Id.* at 622 (citations omitted) (citing, *inter alia*, this court's holding in *Cerrato*).

Although the Eighth Circuit did not specifically address the GERA provisions of the 1991 Act, it held that Congress manifested an unequivocal intent to abrogate the States' Eleventh Amendment immunity as to other provisions of the Act. In rejecting the Eleventh Amendment challenge, the court did so, not because these other provisions standing alone expressly provided that the States were subject to private claims for damages, but because Congress intended these provisions to amend and therefore be read in conjunction with Title VII and the 1972 amendments. *See Okruhlik*, 255 F.3d at 623 ("Although the 1991 amendments do not define 'respondent,' the definition of respondent in Title VII includes state employers."). Likewise here, reading GERA and Title VII *in pari materia*, Congress unequivocally expressed its intent to abrogate the States' Eleventh Amendment immunity: GERA extends Title VII to allow previously exempt state employees to pursue private claims for damages against their employers, and Title VII expressly provides that state employers can be defendants to such claims and therefore abrogates the States' sovereign immunity.

Even examining GERA independent of Title VII, the text of the statute standing alone unequivocally establishes that Congress intended for the States to be defendants to private claims for damages. GERA provides for compensatory but not punitive damages as a remedy for covered "State employees" intentionally discriminated against by any "personnel actions affecting [them]." 42 U.S.C. § 2000e-16b(a)-(b). In

theory, there are two possible defendants to such claims: (1) the States; and (2) the individual state agents who engaged in the discriminatory behavior. At the time Congress enacted GERA, however, all but one of the Circuits to address the issue had held that under Title VII's definition of "employer," individual defendants could not be held liable for damages.[4] *Compare Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) ("Individual capacity suits under Title VII are . . . inappropriate."), *Padway v. Palches*, 665 F.2d 965, 968 (9th Cir. 1982) ("The individual defendants cannot be held liable for back pay."), *Clanton v. Orleans Parish Sch. Bd.*, 649 F.2d 1084, 1099 (5th Cir. 1981) (same), *and Monell v. Dep't of Soc. Servs.*, 532 F.2d 259, 261 (2d Cir. 1976), *rev'd on other grounds*, 436 U.S. 658 (1978) (same), *with Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir. 1989), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir. 1990) (en banc) (holding the opposite).

Although GERA does not define "employer," Congress must have intended, given this significant circuit court precedent and the similarities between GERA and Title VII, for there to be no individual liability under GERA either. Consequently, the only possible defendants to private claims for damages under GERA are the States. GERA's damages remedy would therefore be a nullity if Congress had not intended to abrogate the States' Eleventh Amendment immunity, because covered state employees could not file claims for damages against anyone. This limitation on potential defendants distinguishes the present case from *Dellmuth v. Muth*, 491 U.S. 223 (1989), where the Supreme Court held that Congress did not express its unequivocal intent in the Education of the Handicapped Act to abrogate the States' Eleventh Amendment immunity. There, the Court held that in light of the statutory text, it was only a "*permissible* inference" that

---

[4]The decisions prior to 1991 address only back pay because compensatory damages were unavailable prior to the 1991 Act. *See Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 n.2 (9th Cir. 1993).

States would be defendants to private claims for damages. *Id.* at 232 (emphasis added). Here, to the contrary, it is a *necessary* inference that States would be defendants to private claims for damages, because States are the only possible defendants to such claims. It would be absurd to imagine that when Congress expressly provided for these claims, it did not intend for there to be a responsible party against whom relief could be awarded.

For all of the above reasons, I would hold that when Congress enacted GERA as part of the 1991 Act, it unequivocally intended to abrogate the States' Eleventh Amendment immunity.

## II.   Valid Exercise of § 5 Power

To abrogate the States' Eleventh Amendment immunity, Congress must also "act[ ] pursuant to a valid grant of constitutional authority." *See Tennessee v. Lane*, 541 U.S. 509, 517 (2004) (internal quotation marks omitted). As the Supreme Court has explained, Congress "can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment." *Id.* at 518. Further, Congress "must have a wide berth in devising appropriate remedial and preventative measures for unconstitutional actions" that violate the Fourteenth Amendment. *Id.* at 520; *see also Kimel*, 528 U.S. at 80-81 ("It is for Congress in the first instance to determine whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment, and its conclusions are entitled to much deference." (alteration and internal quotation marks omitted)).

Congress cannot, however, substantively redefine Fourteenth Amendment rights in exercising its § 5 authority. *See Kimel*, 529 U.S. at 81; *see also Lane*, 541 U.S. at 520 ("Congress must have wide latitude in determining where [the line between remedial legislation and substantive redefinition

of Fourteenth Amendment rights] lies. But . . . the distinction exists and must be observed." (citation and internal quotation marks omitted)). The Court has set forth a test to observe this distinction: "Section 5 legislation is valid if it exhibits 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.' " *Lane*, 541 U.S. at 520 (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)). In turn, the Court applies a three-step analysis to determine whether legislation is "congruent and proportional."

The first step of the analysis is "to identify the constitutional right or rights that Congress sought to enforce when it enacted" the legislation. *Id.* at 522; *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001) ("The first step in applying these now familiar principles is to identify with some precision the scope of the constitutional right at issue."). Here, in enacting the relevant GERA provisions, Congress sought to exercise its § 5 power to protect the rights of certain state employees under the Equal Protection Clause of the Fourteenth Amendment to be free from discrimination on the basis of race or sex.[5]

The second step in the analysis is to determine whether the legislation validly enforces these constitutional rights, "a question that must be judged with reference to the historical experience which [the legislation] reflects." *Lane*, 541 U.S. at 523 (internal quotation marks omitted). As the Court explained in *Garrett*, "[o]nce we have determined the metes and bounds of the constitutional right in question, we examine whether Congress identified a history and pattern of unconstitutional . . . discrimination." 531 U.S. at 368. In enacting GERA to provide a remedy to state employees who experi-

---

[5]Although GERA also protects against discrimination on the basis of religion, age, and disability, we do not address these provisions here, as we must identify with "*some precision*," *Garrett*, 531 U.S. at 365 (emphasis added), the constitutional rights at issue.

ence race and gender discrimination, Congress did not need extensive evidence of such discrimination, because race and gender-based classifications are subject to strict and heightened scrutiny respectively. *See Lane*, 541 U.S. at 528-29 ("We explained that because the [Family Medical Leave Act ('FMLA')] was targeted at sex-based classifications, which are subject to a heightened standard of judicial scrutiny, 'it was easier for Congress to show a pattern of state constitutional violations' than in *Garrett* or *Kimel*, both of which concerned legislation that targeted classifications subject to rational-basis review." (quoting *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 735-37 (2003))). Indeed, in holding that there was not sufficient evidence of age-based discrimination for Congress to validly abrogate the States' sovereign immunity under the Age Discrimination in Employment Act ("ADEA"), *Kimel* emphasized that the right at issue did not involve race or gender-based classifications:

> Age classifications, *unlike governmental conduct based on race or gender*, cannot be characterized as so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy. Older persons, again, *unlike those who suffer discrimination on the basis of race or gender, have not been subjected to a history of purposeful unequal treatment.*

528 U.S. at 83 (emphases added) (citation and internal quotations marks omitted).

In light of this standard, I would hold that the evidence before Congress was more than sufficient for Congress to exercise its § 5 authority to enact GERA and abrogate the States' Eleventh Amendment immunity. As discussed above, the 1991 Act and GERA extended Title VII's protections to certain previously excluded state employees. In enacting GERA, Congress was therefore entitled to rely on the exten-

sive evidence from when it enacted the 1972 amendments of widespread employment discrimination by the States on the basis of race and sex. *See Fremont County*, 405 F.3d at 848 ("[B]ecause GERA's language concerning previously exempt state employees is identical to that in Title VII's exclusion, we may accord substantial weight to the legislative history of the cognate Title VII provision in construing [GERA].").

Specifically, in assessing the evidence before it in 1972, Congress found that "widespread discrimination against minorities exists in State and local government employment, and that the existence of this discrimination is perpetuated by the presence of both institutional and overt discriminatory practices." H.R. Rep. No. 92-238, at 19 (1971), *reprinted in* 1972 U.S.C.C.A.N. 2137, 2152. Congress also found that "employment discrimination in State and local governments is more pervasive than in the private sector," and explained that:

> The expansion of Title VII coverage to State and local government employment is firmly embodied in the principles of the Constitution of the United States. The Constitution has recognized that it is inimical to the democratic form of government to allow the existence of discrimination in those bureaucratic systems which most directly affect the daily interactions of this Nation's citizens.

*Id.* at 2152, 2154. As the Tenth Circuit therefore concluded in *Fremont County*, rejecting a Tenth Amendment challenge to GERA: "In passing the 1972 Title VII amendments and continuing through GERA as part of the Civil Rights Act of 1991, Congress provided an expanding class of state employees with what Congress found were *necessary protections* from discrimination." 405 F.3d at 849 (emphasis added).

Supreme Court decisions further recognize that race and gender-based employment discrimination by the States per-

sisted at the time Congress enacted GERA. As the Court explained in *Hibbs* in 2003: "It can hardly be doubted that . . . women still face pervasive . . . discrimination . . . in the job market. According to evidence that was before Congress when it enacted the FMLA [in 1993], States continue to rely on invalid gender stereotypes in the employment context . . . ." 538 U.S. at 730 (alteration, citation, and internal quotation marks omitted). The Court has said the same of workplace discrimination on the basis of race. *See Kimel*, 528 U.S. at 83 ("[T]hose who suffer discrimination on the basis of race . . . have . . . been subjected to a history of purposeful unequal treatment." (internal quotation marks omitted)).

The majority concludes, however, that this evidence of race and gender-based discrimination by the States was insufficient for Congress to validly exercise its § 5 power in enacting GERA. None of the majority's reasons are convincing. As an initial matter, insofar as the majority suggests that GERA's extension of Title VII's protections to elected state officials and their staffs is bad policy, such policy considerations are of course irrelevant to our legal inquiry. It was for Congress alone to decide whether these employees should be protected under Title VII.

The majority also infers from Congress' decision to exclude from the 1972 amendments the state employees now covered by GERA, that the 1972 "hearings did not establish an existing evil" of state discrimination against these employees. This inference, however, is contrary to the congressional record, which suggests that Congress exempted these state employees because certain Senators were concerned about intruding on state rights, not because there was an absence of evidence of discrimination against these employees. As the Tenth Circuit explained in *Fremont County*:

> In the floor debates on the extension of Title VII protections to state employees, Senator Ervin introduced an amendment to exempt those state employees who

were chosen by elected officials or who were close personal advisors to elected officials. In the ensuing debates Senator Allen decried federal government encroachment on the powers of local government that would result. To accommodate these Tenth Amendment concerns, when Congress extended Title VII protections to state employees in 1972 it exempted high-level state employees in recognition of the federalism concerns encompassed in their inclusion. It similarly rejected coverage for congressional employees at that time.

405 F.3d at 848-49 (citations and footnotes omitted) (citing 118 Cong. Rec. 1677, 4096-97, 4483, 4494 (1972)).[6]

Indeed, as the majority recognizes, when Congress found extensive evidence of race and gender-based discrimination by the States in 1972, "the reported instances of discrimination appeared to be across the board." In holding that this widespread evidence of workplace discrimination by the States is not sufficient evidence of discrimination against the particular state employees covered by GERA, the majority parses it more finely than the Supreme Court and our sister circuits have found appropriate. Notably, although the Supreme Court has generally required evidence of constitutional violations by the States, not just private parties, it has otherwise found evidence of a wide variety of constitutional violations relevant to the Eleventh Amendment inquiry. *See Lane*, 541 U.S. at 527 n.16 ("[O]ur cases have recognized that evidence of constitutional violations on the part of *nonstate* governmental actors is relevant to the § 5 inquiry." (emphasis added)); *id.* (noting that "the evidence before the Congress

---

[6]*See also* 118 Cong. Rec. 4494 (statement of Sen. Allen) ("If it is so good for the States, why should it not be equally good for [congressional] employees . . . . I do not feel that the law should be applicable to the States, . . . this is just another instance of the further encroachment by the Federal Government on the powers of local government.").

that enacted the FMLA," which *Hibbs* determined was sufficient to abrogate Eleventh Amendment immunity, "related primarily to the practices of private-sector employers and the Federal Government" and "in fact contained little specific evidence of a pattern of unconstitutional discrimination on the part of the States").

As the Eighth Circuit has explained, the Supreme Court "has generally disallowed remedial legislation founded in Congress's power under Section 5 of the Fourteenth Amendment in instances where Congress failed to establish and identify the *general* problem that the legislation was intended to ameliorate." *Maitland v. Univ. of Minn.*, 260 F.3d 959, 965 n.5 (8th Cir. 2001) (discussing *City of Boerne*, 521 U.S. at 530-32, and *Kimel*, 528 U.S. at 83-86). Conversely, at least where, as here, the remedial legislation protects against discrimination on the basis of classifications subject to heightened or strict scrutiny, and the evidence before Congress established a history of discrimination by the States on the basis of these classifications, the Court has not invalidated such legislation on the ground that the evidence was not exactly or explicitly tailored to the harms that Congress sought to remedy.

Thus, our sister circuits have consistently rejected Eleventh Amendment challenges to specific Title VII protections even where the 1972 findings did not explicitly address the exact type of discrimination at issue. The Eighth and Tenth Circuits, for instance, have upheld Title VII retaliation claims against Eleventh Amendment challenges even though "Congress did not specifically note in the legislative record a widespread pattern of retaliatory discharge by the states." *Warren v. Prejean*, 301 F.3d 893, 899 (8th Cir. 2002); *see also Crumpacker v. Kans. Dep't of Human Res.*, 338 F.3d 1163, 1170 (10th Cir. 2003). As the Tenth Circuit explained:

> The State argues that, while Congress may have identified a pattern of unconstitutional gender dis-

crimination by the states, it failed to identify a pat-
tern of retaliatory conduct by the states. This court,
however, need not parse the legislative findings with
regard to Title VII as finely as the State suggests. . . .
To properly enact legislation under its § 5 authority,
Congress need not identify a pattern of each *form* of
gender discrimination in the workplace by the states.
Rather, Congress need only identify a history and
pattern of unconstitutional behavior on the part of
states. Here, Congress clearly identified a pattern of
unconstitutional employment discrimination on the
basis of gender by the states.

*Crumpacker*, 338 F.3d at 1170 (alteration, citations, and inter-
nal quotation marks omitted).

Similarly, in *Maitland*, the Eighth Circuit rejected the
defendants' contention "that Congress failed to identify a his-
tory and pattern of unconstitutional employment discrimina-
tion by the States *against men* when it enacted and amended
Title VII." 260 F.3d at 964 (emphasis added). As the court
concluded, the Constitution does not require "a parsing of the
legislative findings or review of the 'proportionality and con-
gruity' of remedies to determine whether the Eleventh
Amendment bar also has been removed with respect to Title
VII actions by men." *Id.* at 965. Applying the reasoning of
these decisions here, the evidence before Congress of wide-
spread race and gender-based employment discrimination by
the States was sufficient to support its enactment of GERA,
because Congress did not need to make explicit findings with
regard to the particular subset of state employees covered by
GERA.

In sum, given the deference we owe to Congress when it
exercises its § 5 authority, it was entitled in enacting GERA
to rely on the extensive evidence from 1972 of widespread
race and gender-based discrimination by the States against
their employees. Further, because Congress' 1972 decision to

exempt the state employees now covered by GERA appears to have been based not on a lack of evidence of discrimination but on political considerations, and because neither the Supreme Court nor our sister circuits have parsed more finely evidence of state constitutional violations, we must infer that the across the board findings of employment discrimination by the States encompassed these state employees.[7]

Finally, the majority contends that even if the evidence of discrimination was sufficient as of 1972, "[n]othing in the record shows that a pattern of gender discrimination as to a governor's staff, advisers, and policymakers existed in 1991 when GERA was enacted." As discussed above, see *supra* at 14728-29, however, Supreme Court decisions recognize that the discrimination Congress found in 1972 persisted at the time Congress enacted GERA. *See also* H.R. Rep. No. 102-40(II), at 5 n.4 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 698 (Congress declaring that, "[i]n support of the 1972 amendments to extend Title VII state and local governments," it had "reaffirmed that employment discrimination was pervasive, complex and rooted in 'employment systems' and 'various institutional devices.' "); 1991 Act, Pub. L. No. 102-166, 105 Stat. at 1071 (Congress stating that "additional remedies under Federal law are needed to deter unlawful harassment and intentional discrimination in the workplace").

The third and final step in the "congruent and proportional" analysis is to determine whether the § 5 legislation "is an appropriate response to [the] history and pattern of unequal

---

[7]The majority argues that GERA cannot "piggyback" on Congress' findings from the 1972 amendments. The historical record does not support this colorful characterization of the EEOC's position. The EEOC contends that we should infer that Congress' finding of widespread employment discrimination by the States in 1972 encompassed the subset of state employees covered by GERA. I agree with the EEOC that when Congress changed its position in 1991 and decided as a policy matter to cover these previously excluded state employees, it was, in light of the prior record, entitled to do so.

treatment," *Lane*, 541 U.S. at 530—*i.e.* whether the "rights and remedies created by the [legislation] against the States" are congruent and proportional to the constitutional violations. *Garrett*, 531 U.S. at 372.

I would hold that GERA is an appropriate response to the evidence of employment discrimination by the States. Most importantly, GERA provides for money damages only against state employers who "engaged in unlawful intentional discrimination"— conduct that also directly violates the Equal Protection Clause. *See Okruhlik*, 255 F.3d at 626 ("[T]he elements of a claim of intentional discrimination are essentially the same under Title VII and the Constitution."). Thus, contrary to the legislation at issue in cases such as *Garrett* and *Hibbs*, GERA does not require the States to provide any substantive entitlements to their employees beyond what the Constitution requires.[8] *Cf. Garrett*, 531 U.S. at 361 ("[T]he Act requires employers to make reasonable accommodations to [disabled individuals] . . . ." (alteration and internal quotation marks omitted)).

GERA also imposes other reasonable limits on damages. By incorporating 42 U.S.C. § 1981a(a), GERA provides the same damage remedies to the covered state employees that § 2000e-16 provides to federal employees, instead of the more expansive remedies available to private sector employees.[9]

---

[8]For this reason, although *Hibbs* found that the FMLA was appropriate legislation in part because it exempted those state employees who are covered under GERA, the majority's reliance on *Hibbs* is misplaced. GERA is appropriate legislation even though it covers these employees, because, unlike the FMLA, it subjects state employers to financial burdens only when the harm suffered by the employee rises to the level of a constitutional violation.

[9]Congress also provides similar remedies to federal employees who are similarly situated to the state employees protected by GERA. Specifically, presidential and congressional employees, who were originally covered directly under GERA, are now covered by the Presidential and Executive Office Accountability Act, 3 U.S.C. § 401 *et seq.*, and the Congressional Accountability Act of 1995, 2 U.S.C. § 1301 *et seq.*

Specifically, GERA precludes punitive damages and caps compensatory damages at between $50,000 and $300,000, depending on the size of the state employer. *See* 42 U.S.C. § 1981a(b)(1), (b)(3). Also, prior to acting on a complaint by a state employee, the EEOC must refer the complaint to any state or local fair employment practices agency authorized to grant or seek relief from the alleged discrimination. *Id.* § 2000e-16c(b)(2) (incorporating § 2000e-5(d)). Upon request by the state or local agency, the EEOC must then provide the agency "a reasonable time, but not less than sixty days . . . to act under such State or local law to remedy the practice alleged."[10] *Id.* § 2000e-5(d).

Accordingly, GERA is congruent and proportional to the evidence of the States' violations of its employees' Fourteenth Amendment rights to be free from discrimination on the basis of race or sex. *See Lane*, 541 U.S. at 431 ("Congress was justified in concluding that th[e] difficult and intractable problem [of disability discrimination] warranted added prophylactic measures . . . . The remedy Congress chose is nevertheless a limited one." (alteration and internal quotation marks omitted)); *Hibbs*, 538 U.S. at 738 ("We also find significant the many other limitations that Congress placed on the scope of [the FMLA].").

* * *

For all of the above reasons, I would hold that Congress explicitly abrogated the States' Eleventh Amendment immunity when it enacted GERA, and that the legislation is congruent and proportional to the racial and gender discrimination that Congress sought to remedy. Accordingly, I would reject

---

[10]The EEOC followed these requirements in the instant case by transmitting copies of Ward's and Jones' complaints to the Alaska State Commission for Human Rights, which "acknowledge[d] receipt of the referenced charge[s]" but "indicate[d] [its] intention not to initially investigate the[m]."

Alaska's Eleventh Amendment challenge, and allow the ALJ to rule on the merits of the complainants' claims.